Volume 1 of 2

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LEON J. WINSTON,

*Petitioner-Appellant,*

v.

LORETTA K. KELLY, Warden,
Sussex I State Prison,

*Respondent-Appellee.*

No. 09-2

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, District Judge.
(7:07-cv-00364-sgw-mfu)

Argued: September 23, 2009

Decided: January 27, 2010

Before MICHAEL, GREGORY, and DUNCAN,
Circuit Judges.

Affirmed in part, vacated in part, and remanded by published
opinion. Judge Michael wrote the opinion, in which Judge
Duncan joined. Judge Gregory wrote a separate opinion con-
curring in part and dissenting in part.

**COUNSEL**

**ARGUED**: Jennifer Leigh Givens, FEDERAL COMMU-
NITY DEFENDER'S OFFICE, Philadelphia, Pennsylvania,
for Appellant. Steven Andrew Witmer, OFFICE OF THE
ATTORNEY GENERAL OF VIRGINIA, Richmond, Vir-
ginia, for Appellee. **ON BRIEF:** James H. Moreno, FED-
ERAL COMMUNITY DEFENDER'S OFFICE, Philadelphia,
Pennsylvania, for Appellant. William C. Mims, Attorney
General, Jerry P. Slonaker, Senior Assistant Attorney Gen-
eral, OFFICE OF THE ATTORNEY GENERAL OF VIR-
GINIA, Richmond, Virginia, for Appellee.

---

**OPINION**

MICHAEL, Circuit Judge:

Leon J. Winston was convicted of capital murder and sen-
tenced to death by the Circuit Court for the City of Lynch-
burg, Virginia. After failing to obtain relief in state post-
conviction proceedings, he petitioned the district court for a
writ of habeas corpus. He now appeals the district court's
denial of the writ. Winston presents the following issues, as
authorized by the certificate of appealability: (1) whether he
received ineffective assistance of counsel at the guilt phase of
his trial; (2) whether the state trial court unconstitutionally
denied his request for a lesser included homicide instruction;
(3) whether *Atkins v. Virginia*, 536 U.S. 304 (2002), prohibits
his execution because he is mentally retarded; (4) whether he
received ineffective assistance when his counsel failed to
argue that *Atkins* prohibits his execution; and (5) whether he
otherwise received ineffective assistance at the sentencing
phase of his trial.

We affirm the district court's denial of Winston's ineffec-
tive assistance claims for both the guilt and sentencing phases

of his trial; we also affirm the denial of his jury instruction claim. On Winston's *Atkins* and *Atkins*-related claims, however, we conclude that further proceedings in the district court are required. As the district court recognized, because Winston presented material evidence in his federal habeas hearing with respect to the *Atkins*-related claims that was not considered by the Supreme Court of Virginia, these claims present complex questions concerning the application of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA). A district court may not consider additional evidence in a federal habeas proceeding unless the petitioner has satisfied AEDPA's dual requirements of exhausting state remedies and developing the factual record in the state courts. While these requirements present a high bar for the petitioner, we conclude in this case that Winston cleared the bar. Winston's counsel for both his state and federal habeas applications did not find records of a test score relevant to proving his retardation until two weeks before the evidentiary hearing held by the district court. We hold that it was error for the district court to refuse to consider this evidence because the score does not fundamentally alter Winston's claims and because habeas counsel was diligent in searching for it. We therefore vacate the district court's judgment insofar as it denies Winston's *Atkins* and *Atkins*-related claims, and we remand for further proceedings on these claims.

## I.

### A.

On the morning of Friday, April 19, 2002, two men broke into Rhonda and Anthony Robinson's house. After confronting the Robinsons near their daughters' second-floor bedroom, one of the men followed Anthony Robinson downstairs. There, the man shot Anthony several times. He then returned upstairs and shot Rhonda in front of her daughters, Niesha and Tiesha Whitehead. After the shootings the

men left, leaving Rhonda and Anthony to die from their wounds. Leon Winston was later arrested and tried for the murders.

At trial two witnesses gave essentially uncontradicted testimony that Winston was present at the Robinsons' when the murders occurred. Michelle Lipford, who had been sexually intimate with Winston, testified that she drove him and a man named Kevin Brown to the Robinson house at about 5:00 a.m. on the morning of the murders. After waiting nearby in the car for an indeterminate time, Lipford heard gun shots and then drove off. Tranika Turner, Winston's girlfriend, testified that in response to a telephone request from Winston at 6:00 a.m. that same morning, she picked him up at a carwash near the Robinson house. Turner noted that when she picked him up, Winston was wearing a black hoodie with gray stripes.

To establish that Winston actually shot the Robinsons, the prosecution offered physical evidence, eyewitness testimony, and a confession. For physical evidence, the prosecution introduced a gun that forensic experts had identified as the murder weapon and on which Winston's DNA — and only Winston's DNA — was found. Robin Wilson testified that shortly after the murders Winston had given him the gun to keep.

For eyewitness testimony, the prosecution relied on nine-year-old Niesha Whitehead. While Niesha witnessed many of the events that transpired the morning of the murders, her testimony was somewhat inconsistent, and she could not directly identify Winston. She did, however, testify that her mother's voice woke her on the morning of the murders and that upon waking, she saw two black-skinned men outside her second floor bedroom. She saw one of the men, whom she called "Mr. No Name," follow Anthony Robinson downstairs. She then heard gunshots and saw Mr. No Name return to shoot her mother, Rhonda Robinson. On direct examination Niesha testified that Mr. No Name had a tattoo that looked like a "big

dog," J.A. 39, and wore all black. It is undisputed that Winston has a tattoo on his arm matching the one described by Niesha, but Niesha could not remember whether Mr. No Name's clothing had any stripes on it. On cross examination she answered "Yes" twice when asked whether one man wore all black and one wore black with white stripes. She also answered "Yes" when asked whether the man in white stripes tried to stop Mr. No Name from shooting her mother. Finally, Niesha contradicted her testimony on direct by identifying the man with white stripes as the one with the tattoo.

For evidence of a confession, the prosecution called Nathan Rorls, a long-time friend of Winston's, as a witness. Rorls testified that Winston called him in April of 2002 and told him that he had "slumped two people" in Lynchburg — meaning he had "murdered somebody, killed somebody." *Id.* at 94. Rorls further testified that the day after he received the call, he saw Winston and Winston's cousin Pego (Peyton Carter) at a friend's house. There, Rorls said that Winston told him he had "killed two people and robbed them and stuff." *Id.* at 98. Rorls recounted that Winston proceeded to describe the crime in detail, noting that he (Winston) and "his codefendant" had taken two thousand dollars and two ounces of cocaine from the Robinsons. *Id.* at 101.

Winston did not take the stand. His counsel thus focused on undermining the credibility of the prosecution's witnesses and highlighting inconsistencies in the physical evidence. Pointing to Niesha Whitehead's testimony concerning the shooter's appearance, defense counsel contended that another man, Tywan Turner, was the likely shooter, and that Winston had tried to prevent the shooting. Counsel also challenged Rorls's testimony as fabricated and given to avoid the long prison term he was facing on drug charges. Finally, counsel challenged the testimony of Lipford and Wilson as unreliable and implausible.

The jury returned a verdict of guilty, convicting Winston of capital murder, robbery, and several lesser crimes. In the sen-

tencing phase defense counsel presented testimony from Winston's family describing his troubled childhood. Winston's mother testified that he had never known his father, that she had been in and out of prison for much of his childhood, and that she regularly used PCP, marijuana, cocaine, and alcohol both before and after Winston was born. Winston's grandmother testified that she had frequently taken a very young Winston with her when she committed various larcenies. Finally, defense counsel introduced three psychological evaluations of Winston along with some related records, all from Winston's childhood.

The psychological evaluations, however, were not introduced to prove that Winston was mentally retarded under Virginia law. Rather, they were admitted as ordinary mitigating evidence, describing Winston's sub-average intellectual functioning and troubled childhood. Defense counsel took this approach despite the bounty of evidence in those evaluations and related records relevant to a determination of retardation under the applicable Virginia statute. The evaluations were accompanied by I.Q. scores of 77, 73, and 76, respectively. In one of the evaluations the psychologist commented that Winston was functioning in the "[b]orderline range of abilities" and that his "ability to recall specific verbal facts which are typically acquired through education and experience is extremely deficient and falls within the Mentally Retarded range (1st percentile)." J.A. 2133. In another the psychologist found that Winston had "borderline intellect and severe verbal processing problems." *Id.* The psychologist also noted that Winston's immaturity and passiveness "place him at a risk to be easily manipulated by others. He is likely to always follow the easiest path, the strongest leader." *Id.*

Also in defense counsel's possession, but not submitted to the jury, were additional records from the Fairfax County Department of Student Services and Special Education (Fairfax County). These records showed that Winston was eligible for special education due to "mild retardation," that he "de-

monstrate[d] a reduced rate of intellectual development and a level of academic achievement below that of age peers," and that he "concurrently demonstrate[d] deficits in adaptive behavior." *Id.* at 2133-34. Unlike the psychological evaluations presented to the jury, these records did not include an I.Q. score. An affidavit from a Fairfax County special education professional — obtained long after Winston's trial — indicated that while an additional psychological evaluation and I.Q. test would necessarily have accompanied the County's conclusions about Winston, these additional items had likely been destroyed.

In determining not to pursue a sentencing strategy based on mental retardation, defense counsel apparently relied primarily, if not solely, on the advice of Dr. Evan Nelson, the clinical psychologist appointed to assist Winston during the sentencing phase. Dr. Nelson did an assessment of Winston for use at his sentencing. He reviewed the psychological evaluations and records forwarded to him by counsel and interviewed Winston and members of his family. Dr. Nelson did not interview Winston's teachers and social workers, and he cannot recall whether he saw the Fairfax County record changing Winston's disability classification to mild retardation. Based on the materials before him at the time, Dr. Nelson told defense counsel that "he did not think [they] could prove [that Winston] was mentally retarded as defined by the Virginia statute." J.A. 2135.

Defense counsel were almost completely dependent on Dr. Nelson's analysis. They did not read Winston's psychological records in their entirety before forwarding them to Dr. Nelson, nor is there any evidence that they reviewed them after receiving Dr. Nelson's opinion. The lawyer tasked with gathering mitigation evidence admitted that he had been unable to review all the records and had "relied on Dr. Nelson to thoroughly review the records and tell [him] what [he] needed to know." J.A. at 2134. Neither of Winston's lawyers read the

records containing Fairfax County's change of Winston's disability classification to mild retardation.

After considering the evidence relevant to sentencing, the jury recommended a sentence of death for each of the murders, 73 years for the robbery and related crimes, and $400,000 in fines. The trial court sentenced Winston according to the jury's recommendations, except for suspending the fines. The Supreme Court of Virginia affirmed Winston's convictions and sentence, *Winston v. Commonwealth*, 604 S.E.2d 21 (Va. 2004), and the United States Supreme Court denied certiorari, *Winston v. Virginia*, 546 U.S. 850 (2005).

## B.

Winston later petitioned for habeas relief in the Supreme Court of Virginia. *Winston v. Warden of the Sussex I State Prison*, No. 52501, 2007 WL 678266 (Va. Mar. 7, 2007). In his petition Winston requested an evidentiary hearing and raised multiple claims centering on actual innocence, *Atkins*, and ineffective assistance of counsel. The Virginia Supreme Court denied all relief without allowing an evidentiary hearing. *Id.* at *18. It concluded that Winston's actual innocence claim was not cognizable in habeas, that his *Atkins* claim had not been raised on direct appeal and therefore was procedurally defaulted, and that his ineffective assistance of counsel claims failed on the merits. *Id.* at *1, 3, 6-17. The Virginia Supreme Court did not then have before it Winston's claim that the trial court erred in denying his requested jury instruction on lesser included homicide charges.

Following the denial of his state habeas petition, Winston filed the pending petition in federal district court. In its first opinion, dated May 30, 2008, the district court rejected on the merits Winston's claims of actual innocence, ineffective assistance of counsel at the guilt phase, failure to instruct the jury on lesser offenses, and ineffective assistance of counsel in presenting mitigation evidence at the sentencing phase. How-

ever, with respect to Winston's *Atkins* and *Atkins*-related ineffective assistance of counsel claims, the court reserved decision and ordered an evidentiary hearing. The district court "d[id] not decide that Winston [wa]s entitled to an evidentiary hearing, but rather exercise[d] its discretion" to order one. J.A. 617.

At the hearing the district court heard from nine witnesses over two days and received documentary evidence not presented to the state courts. Of particular importance was the introduction of Winston's missing 1997 psychological evaluation and I.Q. test score from Fairfax County. Just two weeks before the hearing, Winston's habeas counsel found Marilynn Schneider Lageman, the psychologist who administered the test. Lageman testified that she had kept personal copies of Winston's records, and she produced documentation reflecting Winston's I.Q. score of 66. Dr. Daniel Reschly, a mental retardation expert, testified for Winston, opining that "to a reasonable degree of psychological certainty," Winston was mentally retarded under Virginia law before he reached the age of 18. J.A. 2141. After Reschly made what he concluded were proper adjustments for both the Standard Error of Measurement (SEM) and the Flynn effect, the low ranges for Winston's other I.Q. scores were more than two standard deviations below the mean. Reschly further opined that Winston had conceptual, social, and practical adaptive deficits before age 18. In response to Dr. Reschly, the Commonwealth offered an expert, Dr. Leigh Hagan. Dr. Hagan opined that Winston was not mentally retarded before age 18, that there was no basis for adjusting Winston's I.Q. scores due to SEM or the Flynn effect, and that limitations in Winston's adaptive behavior did not significantly impair his functioning.

Winston's trial counsel and mitigation expert also testified at the district court hearing. Counsel admitted that if they had seen the additional I.Q. score of 66, they would have argued that Winston was retarded and therefore ineligible for the death penalty under *Atkins*. Dr. Nelson testified that, in addi-

tion to not having access to the Fairfax County records and I.Q. score, counsel had not provided him with information from certain teachers, social workers, and family members that was relevant to Winston's adaptive functioning. Nelson acknowledged that his prior opinion — that a mental retardation defense was not sustainable — might have been different had he possessed this information.

Following the hearing the district court issued a second opinion, dated March 6, 2009, denying Winston's remaining claims. While the district court reaffirmed its decision to grant an evidentiary hearing, it refused to consider the additional records from Fairfax County, including the I.Q. score of 66, because Winston had failed to exhaust that aspect of his ineffectiveness claim in the state courts. The district court further noted that while Winston had diligently pursued his ineffectiveness claim in the state courts, he had failed to subpoena Lageman or the records of Winston's fourth I.Q. test. After rejecting the additional records from Fairfax County, the district court concluded that nothing excused Winston's procedural default of his *Atkins* claim and that his ineffective assistance claim failed on the merits. This appeal followed.

## II.

We first consider Winston's claims that his conviction should be vacated because he received ineffective assistance of counsel at the guilt phase of his trial or because the trial court erroneously refused to give a lesser-included homicide instruction. We affirm the district court's decision to reject these claims.

## A.

Winston claims that his Sixth and Fourteenth Amendment right to effective assistance of counsel was violated during the guilt phase of his trial. He argues that his trial counsel failed (1) "to prove, as they easily could have, that Rorls' testimony

was a lie" and (2) to pursue effectively their strategy of "t[y-ing] [Tywan] Turner to this crime any and every way [they] could." Appellant's Br. at 11, 13. We agree with the district court that the state court did not unreasonably apply federal law in denying this ineffective assistance claim.

When a state court has adjudicated a claim on the merits, a federal court may grant a writ of habeas corpus only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). We "review[ ] de novo the district court's application of the standards of 28 U.S.C. § 2254(d) to the findings and conclusions of the [state] court." *McNeill v. Polk*, 476 F.3d 206, 210 (4th Cir. 2007). To prevail on an ineffective assistance claim, a petitioner must establish (1) that counsel's performance was deficient and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" to "avoid the distorting effects of hindsight." *Yarbrough v. Johnson*, 520 F.3d 329, 337 (4th Cir. 2008) (quoting *Strickland* 466 U.S. at 689). To establish prejudice under *Strickland*, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Rorls, in a recent affidavit, said that his testimony at Winston's trial was "made up" to get a "bigger sentence cut" in his own drug case. J.A. at 325. Winston argues that Rorls's fabrication would have been apparent to the jury if his counsel had presented testimony from Winston's cousins, Peyton Carter and Joe Lewis. Carter and Lewis attest in affidavits that they

were present at the small gathering at which, according to Rorls's trial testimony, Winston confessed his role in the murders to Rorls for the second time. Both Carter and Lewis swear that they were with or within earshot of Winston the entire time at the gathering, and they did not witness a confession or overhear any private conversation between Winston and Rorls in which Winston confessed. Counsel's failure to interview Carter and Lewis and call them as witnesses, Winston argues, constituted deficient performance that prejudiced his defense.

As the district court observed, Winston's claim that defense counsel should have called Carter and Lewis boils down to the argument that counsel "should have further emphasized that Rorls lied about Winston's admissions in order to reduce Rorls' own prison time." J.A. 594. Defense counsel devoted considerable effort to attacking Rorls's credibility. The very first questions to Rorls on cross-examination were successful in getting him to admit that he was facing a potential life sentence on cocaine conspiracy charges and that he had "dangle[d] out" information to the authorities about the Robinson murders in an effort to shorten his sentence. J.A. 110. Rorls, who had been released from custody, admitted to the jury that he had "bought [his] freedom" with his cooperation. J.A. 109-10. Defense counsel "clearly and repeatedly" used Rorls's admissions to press to the jury the theme that Rorls was lying to reduce his prison time. J.A. 594.

It is easy for Winston to argue now that the testimony of Carter and Lewis should have been offered as part of the attack on Rorls's credibility. But trial strategy decisions are not evaluated "through the distorting effects of hindsight." *Yarbrough*, 520 F.3d at 337. Defense counsel's strategy of attacking Rorls's credibility in the manner chosen, which was undeniably focused and aggressive, "falls within the wide range of reasonable professional assistance." *Id.*

Winston challenges another strategy decision of defense counsel in arguing that they did not sufficiently develop the

theory that Tywan Turner committed the murders. Specifically, Winston argues that counsel should have called Patti Whitehead, the sister of one of the victims and the mother of Turner's children, because she had made a statement to police that Turner was in Lynchburg at the time of the murders. However, one of Winston's defense counsel explained by affidavit that while he and his co-counsel had subpoenaed Whitehead, they did not call her as a witness because they "were unable to talk to her beforehand" and "were unsure what she would say." J.A. 1881. "On habeas review, a federal court generally credits plausible strategic judgments in the trial of a state case." *Vinson v. True*, 436 F.3d 412, 419 (4th Cir. 2006). Here, because defense counsel could not determine beforehand what Whitehead's testimony would be, their decision not to call her was a plausible strategic judgment.

We conclude that defense counsel's representation was not deficient at the guilt phase of Winston's trial. We likewise conclude that the state court did not unreasonably apply *Strickland* in denying Winston's ineffective assistance claim with respect to the guilt phase.

### B.

Winston next argues that his due process rights were violated when the state trial judge refused to instruct the jury on lesser included homicide charges. Although Winston did raise this claim on direct appeal, he did not raise it with the Supreme Court of Virginia in his state habeas petition. The state did not argue in the district court, however, that the claim was unexhausted. Because we conclude that the claim should be denied on the merits, we need not reach exhaustion. *See* 28 U.S.C. § 2254(b)(2).

"In capital cases, due process requires the court to give an instruction on any lesser included offense when the evidence warrants such an instruction." *Bates v. Lee*, 308 F.3d 411, 418 (4th Cir. 2002) (citing *Beck v. Alabama*, 447 U.S. 625, 637-38

(1980)). "*Beck* requires a lesser-included offense instruction when the evidence at trial . . . casts 'some doubt' on a necessary element of the capital charge." *Hyatt v. Branker*, 569 F.3d 162, 174 (4th Cir. 2009). Because each state inevitably has its own rule for when its courts should instruct a jury on lesser included offenses, a federal court first determines whether the state rule offends the federal rule. *See Hopper v. Evans*, 456 U.S. 605, 611-12 (1982); *see also Beck*, 447 U.S. at 628-29. Here, there is no material distinction between the Virginia rule and the federal one. *See Remington v. Commonwealth*, 551 S.E.2d 620, 632-33 (Va. 2001) ("[a] second degree murder instruction is only appropriate where it is supported by the evidence"); *Briley v. Commonwealth*, 273 S.E.2d 48, 54 (Va. 1980) (noting that *Beck* left the Virginia rule unchanged). The Virginia rule therefore poses no constitutional problem on its face; indeed, its application is equivalent to application of the federal rule for the purposes of AEDPA. Accordingly, we consider only whether the state courts' application of the Virginia rule was reasonable.

Winston argues that the evidence permitted the inference that he was not the triggerman and therefore supported an instruction on non-capital murder. Except in the case of murder for hire, Virginia law bars conviction of a capital crime when the accused was not the actual perpetrator. *Frye v. Commonwealth*, 345 S.E.2d 267, 280 (Va. 1986). Given Tranika Turner's unrebutted description of Winston's clothing that evening as being black with grey stripes, Winston contends that a reasonable jury could have concluded from Niesha Whitehead's testimony that his accomplice fired the fatal shots. Winston points specifically to Niesha's testimony that the shooter wore all black and the other man present wore black with white stripes. The jury could therefore have credited Niesha's testimony and disqualified Winston as the triggerman.

Winston ignores the fact that the state court considered this slice of testimony in the context of a wealth of evidence indi-

cating that he was the shooter. As the Virginia Supreme Court held on direct appeal, "[i]n light of the overwhelming evidence indicating that Winston was the triggerman responsible for Rhonda's death, we cannot say that a short passage excerpted from Niesha's testimony was sufficient to merit jury instructions on first or second degree murder, or accessory after the fact." *Winston*, 604 S.E.2d at 44. The evidence at trial pointing to Winston included: Rorls's testimony that Winston confessed to being the shooter; testimony that the gun used in the killings was in Winston's possession and had his DNA on it; Niesha's testimony that a man with a tattoo matching Winston's was the shooter; and Winston's own admission that he was present when the shootings occurred. When the several pieces of evidence pointing to Winston's guilt are measured against the small portion of Niesha's testimony concerning the shooter's clothing — which is itself inconsistent — we cannot conclude that the trial court unreasonably applied controlling law by failing to give the lesser-included offense instruction.

The dissent reaches the opposite conclusion by minimizing the significance of relevant evidence and failing to exercise sufficient deference under AEDPA. The dissent argues that Niesha Whitehead's testimony was consistent with Winston not being the triggerman. However, there is little doubt that Niesha's testimony was inconsistent, with even the dissent noting that Niesha identified both the man in black and the man with stripes as having the "big dog" tattoo. This inconsistency tends to undermine Niesha's testimony as a whole rather than provide reliable evidence supporting the inference that Winston was not the triggerman. Similarly, Niesha's initial failure to remember whether the shooter wore white stripes undermines the black and white distinction defense counsel tried to draw between the two perpetrators.

The dissent appears not to be troubled by the weaknesses in Niesha's testimony because it concludes that "[o]ther than the testimony of Rorls, whose credibility was questioned at

trial, no evidence relied on by the majority can be character-ized as 'overwhelming' evidence that Winston was the trig-german." *Infra* at 48. While the dissent is quick to minimize Rorls's testimony, it was properly admitted into evidence and clearly implicates Winston as the shooter. The fact that Rorls later recanted is irrelevant to our analysis under AEDPA. *See Holland v. Jackson*, 542 U.S. 649, 652 (2004) ("[W]hether a state court's decision was unreasonable must be assessed in light of the record the court had before it."). Similarly, the presence of Winston's DNA on the murder weapon, which was itself entrusted to another by Winston after the murders, permits an inference that Winston was the triggerman. In light of this additional evidence, it was not unreasonable for the Virginia Supreme Court to characterize as "overwhelming" the evidence that Winston was the triggerman.

We cannot see how the dissent can conclude otherwise under AEPDA's deferential standard. The dissent states that "the state court made an unreasonable determination of the facts" when it found that there was overwhelming evidence that Winston was the triggerman. *Infra* at 48-49. The "find-ing" that the dissent points to is a legal determination that the evidence did not support giving a lesser included homicide instruction. Proper consideration of this determination is under § 2254(d)(1) rather than § 2254(d)(2). But even if the dissent has identified the correct standard, it has not demon-strated why the state court's determination was not only incorrect but also unreasonable. The Virginia Supreme Court concluded that no rational juror could have discounted Rorls's testimony, the evidence concerning the murder weapon, and Winston's presence at the scene and still credited Niesha's testimony that a man with white-striped clothing and a tattoo tried to stop the shooting. Assuming this conclusion was error because it crossed the line between making the legal determi-nation of whether an inference is rational and weighing the

evidence, it was not an unreasonable conclusion at variance with AEDPA.[1]

Finally, we disagree with Winston that we should grant him relief because the facts here closely resemble the facts of *Beck*. In *Beck* the evidence was sufficient to establish that the defendant was guilty of a serious, violent offense but left some doubt as to whether he had committed a capital offense. The jury, however, was instructed only on the capital charge. Thus, the jury potentially faced the choice of either convicting the defendant of capital murder because it believed that he was "guilty of some serious crime and should be punished" — an impermissible reason — or acquitting because "whatever his crime, the defendant does not deserve death" — an equally impermissible reason. *Beck*, 447 U.S. at 642. The Supreme Court held that an instruction on the lesser included offense was necessary in these circumstances. Winston's jury, however, did not face the choice of death or acquittal because it was also instructed on robbery and related charges. More important, unlike the state court in *Beck*, the Supreme Court of Virginia concluded that the evidence against Winston on the capital charge was overwhelming. This reasonable conclusion did not leave room for the quantum of doubt required by *Beck*. Accordingly, *Beck* did not mandate a lesser-included offense instruction.

## III.

We next consider Winston's claims that his sentence should be vacated because: (1) *Atkins v. Virginia*, 536 U.S. 304 (2002), bars his execution; (2) he received ineffective assistance when his counsel failed to argue that *Atkins* barred his

---

[1]The dissent stresses that *Beck* does not present a sufficiency of the evidence issue. We agree. The fact that the evidence supported the jury's verdict is not dispositive. However, we disagree with the dissent to the extent it assumes that evidence besides Niesha's testimony is irrelevant to answering the *Beck* inquiry.

execution; and (3) he received ineffective assistance when his counsel failed to adequately present mitigating evidence during the sentencing phase. Our treatment of Winston's *Atkins*-related ineffective assistance claim renders analysis of Winston's *Atkins* claim unnecessary. Winston concedes that his *Atkins* claim is procedurally barred absent a valid excuse, and ineffective assistance is one such excuse. Because we vacate the district court's decision and remand on Winston's *Atkins*-related ineffective assistance of counsel claim, we need not decide on this appeal whether any other excuse applies.

A.

Winston claims that he received ineffective assistance when his counsel failed to mount a defense under *Atkins v. Virginia*, 536 U.S. 304 (2002). In *Atkins* the Supreme Court held that the Eighth Amendment prohibits the execution of the mentally retarded, but it left to the states the task of enforcing the constitutional restriction. *Id.* at 306, 317. The Virginia legislature enacted a statute defining mental retardation shortly after *Atkins* was decided. To prove mental retardation under the statute, the accused must establish a disability, "originating before the age of 18 years," characterized by both

> (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.

Va. Code. Ann. § 19.2-264.3:1.1(A). The Supreme Court of Virginia later held that "[w]hether [a defendant] is mentally retarded [is] a factual issue for the jury to determine." *Atkins v. Commonwealth*, 631 S.E.2d 93, 98 (Va. 2006).

The district court rejected Winston's *Atkins*-related ineffective assistance claim, concluding that *Strickland*'s prejudice requirement had not been satisfied. Proving prejudice required Winston to demonstrate a reasonable probability that a fact-finder would have determined he was mentally retarded under Virginia law. In rejecting Winston's claim in his state habeas proceeding, the Virginia Supreme Court focused on whether Winston had demonstrated "significantly subaverage intellectual functioning." To this end, Winston had presented the state court with I.Q. scores of 77, 73, and 76 as well as evidence that Fairfax County had diagnosed him with mild retardation in 1997. The Virginia Supreme Court rejected the three I.Q. scores as evidence of retardation because it had previous held "that the maximum score for a classification of mental retardation [was] an I.Q. score of 70." J.A. 305. The court rejected the Fairfax County diagnosis because it had been made for the purpose of establishing special education eligibility, and the definition of mental retardation used by the county did not require an I.Q. score below 70. The district court concluded that the Virginia Supreme Court's determination was not objectively unreasonable.

In reaching its decision, however, the district court refused to consider new evidence that Fairfax County did indeed give Winston an I.Q. test and that the score was 66 — clearly below 70. In Winston's state habeas proceedings, the Virginia Supreme Court had denied, without explanation, his motion for discovery and an evidentiary hearing to further develop the factual basis of his claims. Consequently, it was not until two weeks before the evidentiary hearing scheduled by the district court that Winston, through the efforts of his counsel, was able to obtain the additional test score. The district court noted that the new evidence "rais[ed] interrelated questions of whether Winston failed to develop in state court proceedings the factual basis he now relies on to support his ineffective assistance claim and whether Winston has failed to exhaust that claim." J.A. 2148. After the evidentiary hearing, however, the district court concluded that both questions were

"perhaps best viewed analytically as exhaustion questions." *Id.* It determined that the potentially dispositive new evidence should not be considered on the merits because it rendered Winston's claim unexhausted.

The application of AEDPA is, of course, implicated in the question of whether the district court should have considered Winston's new evidence. We agree with the district court's original observation that the question raises both an exhaustion issue and a failure-to-develop issue. We disagree that the two issues should be collapsed into an exhaustion issue post hearing, and we therefore consider each in turn. *See Boyko v. Parke*, 259 F.3d 781, 788-92 (7th Cir. 2001). Finally, we note that because mental retardation is at bottom a factual issue, review of Winston's new evidence implicates § 2254(d)(2) and § 2254(e)(1), both provisions of AEDPA governing federal habeas review of state court factual findings. Because we conclude that the district court should have considered the evidence, we will discuss the appropriate application of these provisions on remand.

1.

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1). The exhaustion requirement applies as much to the development of facts material to a petitioner's claims as it does to the legal principles underlying those claims. *See Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). For a claim to be exhausted, "both the operative facts and the controlling legal principles must be presented to the state court." *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997) (quotation marks and citations omitted). If the rule was otherwise, petitioners could "expedite federal review by deliberately withholding essential facts from the state courts," thus upsetting the careful balance struck by Congress between

respecting the finality of state court judgments and enforcing federal rights. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986). The exhaustion requirement does not, however, prohibit a district court from considering evidence not presented to the state courts. "[S]upplemental evidence" that does not "fundamentally alter the legal claim already considered by the state courts" can properly be considered by a district court. *Id.* The question of when new evidence "fundamentally alters" an otherwise exhausted claim "is necessarily case and fact specific." *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005).

In *Vasquez v. Hillery* the Supreme Court addressed the tension between the exhaustion requirement and consideration of new evidence. In that case the petitioner alleged that African-Americans had been systematically excluded from the grand jury that indicted him. In the federal habeas proceeding, the petitioner introduced two categories of evidence that had not been presented to the state courts: (1) affidavits stating that qualified African-Americans had been available but had not been called; and (2) statistical evidence — based on census data that had been available to the state courts — assessing the mathematical probability that chance could have accounted for the exclusion of African-Americans from grand jury panels. The Court held that the affidavits supported a proposition already well-substantiated by the record before the state courts and that the statistical analysis "added nothing to the case that th[e] Court had not considered intrinsic to the consideration of any grand jury discrimination claim." 474 U.S. at 259. Without further explanation, the Court concluded that this evidence could be considered because it did not fundamentally alter the petitioner's equal protection claim.

We read *Vasquez* to permit a district court to consider new evidence if it supports factual allegations for which there is already at least some support in the state record. The evidence in *Vasquez* was supplemental insofar as there was already evidence in the state record from which a fact-finder could reasonably determine the existence of facts essential to the

petitioner's claim. This reading is consistent with circuit precedent requiring petitioners to present the operative facts of their claims to the state courts. *Matthews*, 105 F.3d at 911. We note that the *strength* of the evidence in the state court record is irrelevant to our interpretation. Suppose, for example, that a petitioner on federal habeas introduces new evidence to establish the existence of fact X, a fact required to prove his claim. The claim will inevitably be stronger, regardless of the evidence the petitioner presented to the state courts. However, if the petitioner presented *no evidence* to the state courts to establish the existence of fact X, the claim will be fundamentally altered by the new evidence presented to the district court.

The district court concluded that the addition of Winston's 1997 I.Q. score of 66 fundamentally altered his ineffective assistance of counsel claim under *Vasquez*. It relied primarily on two rationales, the first centering on the potentially dispositive nature of the evidence:

> Had the Supreme Court of Virginia confronted a full-scale I.Q. score of 66, it might have viewed the *Strickland* prejudice prong differently. Instead, Winston presented three scores over 70 and evidence that a likely non-retrievable fourth score might have been under 70. Therefore, there is a substantial difference between the operative facts that the Supreme Court of Virginia confronted and the operative facts here.

J.A. 2150. As an alternative rationale, the district court cited counsel's failure to ask the Virginia Supreme Court for subpoena power. With that power, counsel could have subpoenaed Lageman and discovered the score during state habeas proceedings. Because counsel could have obtained and presented the score to the state court, the district court reasoned that they cannot now present it to the federal courts.

We conclude that the district court erred in its analysis. First, it is irrelevant to the "fundamentally alters" inquiry

whether the Virginia Supreme Court would have decided the claim differently had it seen the new evidence presented by Winston. As noted above, whether new evidence fundamentally alters a claim does not depend on whether it makes the claim stronger. The key is whether Winston offered some evidence in state court to support the factual claim that he possesses significantly sub-average intellectual functioning as measured by a standardized test. Winston presented evidence to the Virginia Supreme Court that Fairfax County had diagnosed him as mentally retarded based on standardized testing, that one I.Q. score should be considered below 70 due to the Flynn effect, and that he possessed substantial deficits in adaptive behavior. While the Virginia Supreme Court was unpersuaded in the absence of an actual score below 70, the court's determination was based on the weight of the evidence rather than the lack of *any* evidence to support Winston's claim.

*Wise v. Warden, Maryland Penitentiary*, 839 F.2d 1030 (4th Cir. 1988), a case cited by the district court, does not preclude our analysis. In *Wise* the petitioner claimed that the prosecution had violated *Giglio v. United States*, 405 U.S. 150 (1972), by withholding a cooperation agreement with a key witness. In the state courts the petitioner had offered little more than "bald assertions" and the affidavit of a fellow inmate attesting to the existence of the agreement. *Wise*, 839 F.2d at 1032, 1034. In the district court, however, the petitioner presented the agreement itself as well as statements by the inmate-witness to the police. *Wise* held that the claim had not been exhausted, noting that there was "a world of difference between conjecture and proof" and that mere conjecture was all that supported the petitioner's claim when it was presented to the state courts. *Id.* at 1034. While *Wise* did refer to the "significantly different and stronger evidentiary posture" of the petitioner's claim in the district court, *id.* at 1033 (quoting *Brown v. Estelle*, 701 F.2d 494, 495 (5th Cir. 1983)), it used the words "*significantly different* and stronger" to distinguish a claim without evidentiary support from one with evi-

dentiary support. Unlike the case before us today, no reasonable fact-finder in *Wise* could have found the facts necessary to support the petitioner's claim from the evidence presented to the state courts.

The district court's alternative rationale fares no better. Winston's failure to request a subpoena from the Virginia Supreme Court is simply not relevant to the "fundamentally alters" inquiry. Indeed, considering this "failure" conflates the exhaustion inquiry with the standard for obtaining an evidentiary hearing under 28 U.S.C. § 2254(e)(2), which we discuss below. We note, however, that even if Winston's efforts in the state proceedings were relevant, the district court would have been wrong to hold Winston responsible for failing to seek a subpoena. Death penalty habeas petitioners seeking discovery in Virginia are required by statute to request an evidentiary hearing from the Virginia Supreme Court. *See* Va. Code. § 8.01-654(c)(1); *see also Hedrick v. Warden of the Sussex I State Prison*, 570 S.E.2d 840, 862 (Va. 2002). Only if that court grants the hearing request and refers the petitioner to a circuit court for discovery would a subpoena request be appropriate. Here, Winston did request an evidentiary hearing from the Virginia Supreme Court, and that hearing was denied. Requesting a subpoena directly would have been procedurally improper, and Winston cannot be faulted for failing to take that step.

2.

In district court the state did not argue that the introduction of the 1997 I.Q. score fundamentally altered Winston's ineffective assistance claim. Instead, it argued that the court could not consider the score because Winston had failed to develop the factual basis of his claim in the state courts. At oral argument before us, the state continued to advance this failure-to-develop argument despite tacit acknowledgment that the district court had correctly applied the "fundamentally alters" test. We agree that the question of whether Winston failed to

develop the factual basis of his claim in the state courts is independent of the exhaustion question. We conclude, however, that Winston did not fail to develop the factual record in state court.

The requirement that petitioners develop the factual basis of their claims in the state courts has its source in 28 U.S.C. § 2254(e)(2):

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that —
>
> (A) the claim relies on —
>
> (1) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

The Supreme Court has held that the word "failed" in the opening line of this section connotes fault. *Michael Williams v. Taylor*, 529 U.S. 420, 431-32 (2000). Specifically, it held that "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."

*Id.* at 432. If a district court concludes that the petitioner was diligent in developing the factual basis of his claim, it may grant an evidentiary hearing as an exercise of discretion. *Schriro v. Landrian*, 550 U.S. 465, 473 (2007) ("Prior to [AEDPA], the decision to grant an evidentiary hearing was generally left to the sound discretion of district courts. That basic rule has not changed."). This discretion should, however, be exercised with restraint. "[F]ederal evidentiary hearings ought to be the exception, not the rule." *Pike v. Guarino*, 492 F.3d 61, 70 (1st Cir. 2007). They are not "intended to provide a forum in which to retry state cases," but rather their "prototypical purpose [is] to fill a gap in the record or to supplement the record on a specific point." *Id.* As the Supreme Court has said: "Because the deferential standards prescribed by [AEDPA] control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Schriro*, 550 U.S. at 474.

In its first opinion the district court concluded that it had discretion to grant Winston a hearing on his *Atkins* and *Atkins*-related ineffective assistance claims, and it exercised that discretion. After citing to the requirements of § 2254(e)(2), the district court held that: "(1) Winston diligently pursued his habeas corpus claims that *Atkins* bars his execution and that he received ineffective assistance of counsel through the failure to investigate this claim; and (2) it is not wholly implausible that he could establish his claims even in light of AEDPA's deferential standards." J.A. 617. In its post-hearing second opinion the district court declined to reconsider its finding of diligence. It is therefore somewhat puzzling that the state goes so far as to declare in its brief that "[t]he district court's finding with respect to Winston's failure to develop this claim is exceptionally clear: Winston did not exercise due diligence." Appellee's Br. at 37. The state is wrong.

Perhaps the district court confused the state by considering Winston's failure to seek a subpoena in its analysis of the

exhaustion question. Whether Winston could have or should have sought a subpoena is relevant to the issue of Winston's diligence, not the issue of exhaustion. In any event, we do not read the district court's discussion of the subpoena matter as a retreat from its otherwise clear finding of diligence. Moreover, as we have noted, whatever fault the district court assigned to Winston for failing to seek a subpoena was simply misplaced.

Finally, we cannot say that the district court abused its discretion in holding an evidentiary hearing. The district court specifically considered whether to hold a hearing in light of AEDPA's deferential standards, and the court concluded that it was not implausible that Winston would succeed if he proved the facts alleged in his petition. Winston had never had a hearing on his *Atkins* and *Atkins*-related ineffective assistance claims because the Virginia Supreme Court denied him one, and the district court acted properly to provide him such an opportunity on a colorable claim. The district court narrowly tailored the hearing to supplement the record on a particular issue, and there was no attempt to retry the entire case against Winston.

Because we can find no legitimate justification for the district court's exclusion of Winston's 1997 I.Q. score, we conclude that remand is appropriate so that the court can reconsider Winston's *Atkins*-related ineffective assistance claim with the score in evidence. The district court was wrong to exclude the score on the ground that it rendered Winston's claim unexhausted, and the state is wrong that the score should have been excluded because the hearing in which the score was introduced was improperly granted. Winston is entitled to a decision on his claim based on all of the admissible evidence in the record. We remand for the district court to make this decision in the first instance.

3.

The issue remains as to what standard of review the district court should apply on remand. Winston insists that the district

court should apply § 2254(e)(1) because that provision applies exclusively when an evidentiary hearing is appropriate in federal court. The state counters that the district court was right to apply § 2254(d)(2). While we reject Winston's argument that § 2254(d)(2) will never apply once the district court has granted an evidentiary hearing, we conclude that it does not apply in this particular case. The district court should still apply § 2254(e)(1) to any factual findings made by the state court and make any additional findings necessary to resolve Winston's claims. Once the facts are determined, the district court should apply *Strickland*'s standards without any deference to the decision of the Supreme Court of Virginia. The Virginia court had its opportunity to consider a more complete record, but chose to deny Winston's request for an evidentiary hearing. Accordingly, comity and finality do not require deference when material evidence later surfaces in a federal habeas hearing.

i.

Section 2254(d) provides AEDPA's framework for reviewing habeas petitions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in
the State court proceeding.

Section 2254(d)(1) describes the standard of review to be applied to claims challenging how the state courts applied federal law, while § 2254(d)(2) describes the standard to be applied to claims challenging how the state courts determined the facts. Both provisions direct federal courts to assess the reasonableness of the state court determinations, and both assessments must be made in light of the evidence the state courts had before them. *Holland*, 542 U.S. at 652. The only limitation on § 2254(d)'s application is that the claims submitted must have been "adjudicated on the merits" in state court. When a claim has not been adjudicated on the merits by the state court, a federal court reviews the claim de novo. *Cone v. Bell*, 129 S. Ct. 1769, 1784 (2009); *Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003); *Wilson v. Workman*, 577 F.3d 1284, 1290 (10th Cir. 2009); *Pike*, 492 F.3d at 67; *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003).

A state court's judgment is unreasonable under § 2254(d)(1) "if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *McNeill v. Polk*, 476 F.3d 206, 211 (4th Cir. 2007) (quotation marks and citations omitted). The state court's application, however, "must have been more than incorrect or erroneous. . . . [It] must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quotation marks and citations omitted); *accord Terry Williams v. Taylor*, 529 U.S. 362, 410-12 (2000). A similar analysis naturally applies to the analogous and adjacent language in § 2254(d)(2). For a state court's factual determination to be unreasonable under § 2254(d)(2), it must be more than merely incorrect or erroneous. *Schriro*, 550 U.S. at 474. It must be sufficiently against the weight of the evidence that it is objectively unreasonable.

An apparent tension between § 2254(d)(2) and § 2254(e)(1) arises because the latter section provides an alternate and

seemingly inconsistent standard for review of state court factual determinations:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

This section does not concern itself with the reasonableness of factual determinations by the state courts but with the correctness or incorrectness of those determinations. It further assigns a burden of proof to the petitioner — clear and convincing evidence — for negating them. Finally, unlike § 2254(d), there are no limitations on the application of § 2254(e). The precise interplay between these provisions has split the courts of appeals. *See Lambert v. Blackwell*, 387 F.3d 210, 234 (3d Cir. 2004) ("a comprehensive interpretation of AEDPA's factual review scheme has yet to emerge from the federal courts"); *Wood v. Allen*, 542 F.3d 1281, 1303-05 & n.23 (11th Cir. 2008);[2] *Teti v. Bender*, 507 F.3d 50, 57-58 (1st Cir. 2007); *Guidry v. Dretke*, 397 F.3d 306, 324-27 (5th Cir. 2005); *Taylor v. Maddox*, 366 F.3d 992, 999-1001 (9th Cir. 2004).

The Supreme Court has held that § 2254(d)(2) and

---

[2]The Supreme Court granted certiorari in *Wood v. Allen* and issued its decision on January 20, 2010, without addressing the question we consider above. The Court acknowledged that "[a]lthough we granted certiorari to resolve the question of how §§ 2254(d)(2) and (e)(1) fit together, we find once more that we need not reach this question, because our view of the reasonableness of the state court's factual determination in this case does not turn on any interpretive difference regarding the relationship between these provisions." *Wood v. Allen*, No. 08-9156, 558 U.S. __, slip op. at 9 (Jan. 20, 2010). Nothing in our opinion today is inconsistent with the Court's decision.

§ 2254(e)(1) provide "independent requirements" for review by the federal courts. *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003). The sections should not, for instance, be merged to "require [the] petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence." *Id.* Both provisions apply independently to all habeas petitions. "To secure habeas relief, petitioner must demonstrate that a state court's [factual] finding . . . was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), *and* that [it] was 'objectively unreasonable' in light of the record before the court." *Id.* at 348 (emphasis added); *accord Miller-El v. Dretke*, 545 U.S. 231, 266 (2005). The Supreme Court has nevertheless left open the precise question of when and how § 2254(e)(1)'s presumption of correctness applies. *See Rice v. Collins*, 546 U.S. 333, 339 (2006).

Given these principles, we conclude that § 2254(d)(2) and § 2254(e)(1) will both ordinarily apply even after a district court has properly held an evidentiary hearing. First, we can discern nothing inconsistent with the concurrent application of § 2254(d)(2) and § 2254(e)(1) after a district court has held an evidentiary hearing. If a petitioner succeeds under § 2254(e)(1), he has merely proven that the state court finding was incorrect. To satisfy § 2254(d)(2), the petitioner must prove that the state court was not only incorrect, but also objectively unreasonable. Second, § 2254(e)(1) should apply because there is no limitation in the section's text. While there might a situation when it would be improper to apply a presumption of correctness to state court factual findings, for example, when the state proceedings violated due process, this would be the exception rather than the rule. *See Taylor*, 366 F.3d at 1000; *see also* 1 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 20.2c. Third, the only limitation on § 2254(d)(2) — that the claim have been adjudicated on the merits — will not automatically apply simply because the district court held an evidentiary hearing. If the record evidence after the hearing is substantially the same as the evidence presented to the state court,

there is no reason why the district court cannot assess whether the state court made an "unreasonable determination of the facts in light of the evidence" presented to it.

When, however, the petitioner offers, for the first time in federal habeas proceedings, new, material evidence that the state court could have considered had it permitted further development of the facts, an assessment under § 2254(d) may be inappropriate. The requirement that § 2254(d) be applied only to claims "adjudicated on the merits" exists because comity, finality, and federalism counsel deference to the judgments of state courts when they are made on a complete record. *Cf. Michael Williams*, 529 U.S. at 436. "In this respect, the 'exhaustion' and 'adjudicated on the merits' elements of federal habeas practice are mirror images." *Wilson*, 577 F.3d at 1292. Exhaustion requires that the state courts have an opportunity to apply the law and consider all the evidence relevant to the petitioner's claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Vasquez*, 474 U.S. at 257. When a state court refuses to opine on the merits of a claim properly presented to it, exhaustion is satisfied. *Cone*, 129 S. Ct. at 1784; *Pike*, 492 F.3d at 67. Similarly, when a state court forecloses further development of the factual record, it passes up the opportunity that exhaustion ensures. *Wilson*, 577 F.3d at 1292-93; *Drake*, 321 F.3d at 345; *see also Monroe*, 323 F.3d at 297-98. If the record ultimately proves to be incomplete, deference to the state court's judgment would be inappropriate because judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d). *Wilson*, 577 F.3d at 1292; *Drake*, 321 F.3d at 345. New, material evidence, introduced for the first time during federal habeas proceedings, may therefore require a de novo review of petitioner's claim.

Our conclusion is not new to this circuit. In *Monroe v. Angelone*, 323 F.3d 286 (2003), we held that "AEDPA's deference requirement does not apply when a claim made on federal habeas review is premised on *Brady* material that has

surfaced for the first time during federal habeas proceedings." *Id.* at 297. In *Monroe* the petitioner had sought habeas relief from the Supreme Court of Virginia for violations of *Brady v. Maryland*, 373 U.S. 83 (1963), based on nine categories of exculpatory evidence allegedly withheld by the prosecution. The petitioner had also sought discovery to seek disclosure of additional evidence that might have been withheld. The state court denied his claims and "refused, without explanation, to authorize . . . discovery." *Monroe*, 323 F.3d at 294. The federal district court, however, granted discovery and an evidentiary hearing, and the petitioner uncovered several additional categories of withheld exculpatory evidence. On appeal we held that de novo review was appropriate for those portions of petitioner's *Brady* claim that were based on the new evidence. *Id.* at 297. In addition, we held that it was necessary to consider all the evidence in the record — not just the new evidence — because the materiality element of a *Brady* claim requires a collective assessment of whether introduction of the exculpatory evidence might have affected the outcome of the trial. As a result, we could not "accord AEDPA deference on an item-by-item basis to the . . . items of exculpatory material considered in state court." *Id.* at 298.

Our conclusion in this case is also consistent with holdings reached in similar cases in the Second and Tenth Circuits. In *Drake v. Portuondo*, 321 F.3d 338 (2d Cir. 2003), the Second Circuit concluded that de novo review of the petitioner's due process claim was appropriate when "the state courts did not permit the development of the factual record" and therefore relied on an incomplete record in denying the claim. *Id.* at 345. Indeed, the Second Circuit actually remanded the case for discovery and an evidentiary hearing. In *Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009), the Tenth Circuit, sitting en banc, concluded that de novo review of the petitioner's ineffective assistance claims was appropriate because the Oklahoma state courts denied the claims based "on a factual record that was, solely as a result of [a] state procedural rule, incomplete." *Id.* at 1290-91. Like the Virginia

Supreme Court in this case, the Oklahoma Court of Criminal Appeals denied the petitioner an evidentiary hearing and therefore passed up any opportunity to consider evidence material to the petitioner's ineffective assistance claim.

The court in *Wilson* also addressed what might be an additional concern with our conclusion today: that habeas petitioners seeking de novo review of their claims need only produce some small sliver of new evidence in federal court. Like the *Wilson* court, we conclude that this concern is "greatly exaggerated." *Id.* at 1294. As we have emphasized above, the requirements that petitioners exhaust their state remedies and diligently develop the record in state court are exacting burdens. Even if the state courts deny a petitioner's request for an evidentiary hearing, new evidence surfacing in federal court that fundamentally alters a claim will render the claim unexhausted. Similarly, while requesting an evidentiary hearing from the state courts may be necessary to satisfy § 2254(e)(2)'s diligence requirement, it may not always be sufficient. *See Michael Williams*, 529 U.S. at 437 ("Diligence will require in the usual case that the prisoner, *at a minimum*, seek an evidentiary hearing in state court in the manner prescribed by state law.") (emphasis added). "In light of these safeguards, we see little risk that habeas petitioners will misapply [our] holding to obtain unwarranted de novo review in the federal courts." *Wilson*, 577 F.3d at 1295.

ii.

Turning more specifically to this case, we hold that § 2254(d) does not apply to Winston's *Atkins*-related ineffective assistance claim and that the district court should not afford deference to the Supreme Court of Virginia's application of *Strickland*. Winston's additional I.Q. score is material to whether he is retarded under Virginia law and therefore material to whether he was prejudiced under *Strickland* by his counsel's conduct. Moreover, like the petitioner in our *Monroe* opinion, Winston requested discovery and an evidentiary

hearing from the state court to further develop the factual record. Like the state court in *Monroe*, the Virginia Supreme Court denied Winston's request and passed on the opportunity to adjudicate Winston's claim on a complete record. Finally, as in *Monroe*, the state court adjudicated a claim that was materially incomplete. The deficient performance and prejudice inquiries under *Strickland* present mixed questions of law and fact, *Smith v. Moore*, 137 F.3d 808, 817 (4th Cir. 1998), that require a collective evaluation of the evidence rather than an analysis confined to a subset of the facts. *See Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995); *see also Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003). Consequently, the Virginia Supreme Court's legal conclusions are not neatly separable into those based on a complete record and those based on an incomplete record. Accordingly, on remand the district court should not afford any deference under AEDPA to the Virginia Supreme Court's application of the *Strickland* standards.

AEDPA deference under § 2254(e)(1), however, will be appropriate to any relevant factual findings made by the Virginia Supreme Court. While that court does not appear to have found that Winston was not mentally retarded — a factual matter — we note that it did make several factual findings concerning the tests Winston took and the Fairfax County assessment procedures. On remand these findings are entitled to a presumption of correctness, and should Winston wish to overcome this presumption, he will have to do so by clear and convincing evidence. Where the Virginia Supreme Court did not make a factual finding, the district court must make its own without regard to what the state court might have done.

Finally, in making its factual determinations, the district court should not only consider Winston's 1997 I.Q. score, but also decide whether to consider Winston's proffered evidence concerning the Flynn effect and SEM. The only time the Virginia Supreme Court has even mentioned the Flynn effect in

a published opinion was in this case, and it has never considered the effect of SEM. The Virginia court did not discuss the Flynn effect beyond stating that Winston had offered evidence concerning it. The court concluded that:

> This Court has previously held that the maximum score for a classification of mental retardation is an I.Q. score of 70. Petitioner provides no documentation that he was diagnosed as being mentally retarded before the age of 18 in accordance with the legal definition of mental retardation established by the legislature. Thus, petitioner has failed [to satisfy the requirements of *Strickland*].

J.A. 305-06 (citations omitted). The most that can be reasonably inferred from this holding is that the Virginia Supreme Court was unconvinced by Winston's evidence concerning the Flynn effect and SEM. While a federal court sitting in habeas could not conclude that such a holding violated § 2254(d), *see Green v. Johnson*, 515 F.3d 290, 300 n.2 (4th Cir. 2008), the district court will not be applying Section 2254(d) on remand. Instead, it will be weighing Winston's expert evidence, documentary evidence, and proffered testimony — taking § 2254(e)(1) into account when necessary — to determine the facts. Once determined, the district court will consider de novo whether there is a reasonable probability that, but for his counsel's deficient performance, Winston would have succeeded on his *Atkins* claim.

## B.

Lastly, we affirm the district court's denial of Winston's claim that he received ineffective assistance when his counsel failed to present an adequate case in mitigation. The Supreme Court of Virginia held that Winston had failed to demonstrate deficient performance and prejudice, and the district court held that this was not an unreasonable application of *Strick-*

*land*. We affirm because it was not unreasonable to conclude that there was no prejudice.

Because a verdict recommending death in Virginia must be unanimous, Va. Code Ann. § 19.2-264.4(E), the prejudice inquiry requires Winston to demonstrate that there was a reasonable probability that, but for his counsel's failures, a single juror would have voted against death. Each juror has discretion to vote for death provided that: (1) the prosecution proves one of Virginia's statutory aggravating factors beyond a reasonable doubt; and (2) the jury considers all the evidence in mitigation. *See Watkins v. Virginia*, 331 S.E.2d 422, 437-38 (Va. 1985). Winston does not argue that either of these requirements was not satisfied. Accordingly, we consider whether the Supreme Court of Virginia unreasonably applied federal law when it concluded that no juror would have exercised his or her discretion to vote against death.

Winston argues that the Virginia Supreme Court unreasonably applied federal law because at least one juror would have exercised his or her discretion to vote against death if: (1) his trial counsel had elicited facts concerning his sub-average intellectual functioning through live witnesses rather than through the written psychological reports that were submitted to the jury; (2) the jury had seen Winston's 1997 psychological records and I.Q. score of 66; and (3) his trial counsel had presented a more detailed narrative of his traumatic childhood. In rejecting these arguments, the Virginia Supreme Court emphasized that Winston "does not identify the substance of any additional evidence he contends counsel should have presented and does not explain how such evidence would not have been cumulative." J.A. 306; *accord id.* at 308.

In rejecting Winston's first argument about the need for live witnesses on the issue of low functioning intelligence, the Virginia Supreme Court rested its determination primarily on the rich content of the written psychological reports. The reports contained many assessments easily understood by the

lay juror, including findings that Winston was of "mentally deficient to average intelligence" with "extreme problems maintaining attention and effort" and "many emotional concerns resulting from his abandonment and rejection from various family members." *Id.* at 306. Hence, the core of Winston's mitigation case was before the jury. Also, Winston had not shown that any particular testimony would have materially added to the reports.

Winston responds by arguing that the manner rather than the substance of counsel's mitigation case is the critical factor. He argues that the district court "treats manner of presentation as a complete irrelevancy." Appellant's Br. at 77. Winston does not, however, cite any case law in this circuit to support his argument. Moreover, what case law Winston does cite does not stand for the proposition that ineffective assistance follows from a failure to present evidence through live witnesses. *See, e.g.*, *Gray v. Branker*, 529 F.3d 220, 234-38 (4th Cir. 2008) (prejudice found when counsel offered no medical explanation for defendant's behavior); *Williams v. Allen*, 542 F.3d 1326, 1342 (11th Cir. 2008) (prejudice found when counsel failed to discover evidence that "paint[ed] a vastly different picture" than that presented to the jury). While we acknowledge that there might be a case when the manner in which counsel presents evidence is so abysmal that it supports a finding of prejudice, the line would have to be drawn carefully so as not to conflate deficient performance with prejudice. We simply cannot conclude in this case that the Virginia Supreme Court unreasonably applied federal law by discounting the manner in which counsel presented mitigation evidence.

Winston's second argument — based on counsel's failure to introduce his 1997 psychological records and I.Q. score — does not survive a careful comparison of the psychological records the jury did see and the records it did not. Winston's 1997 psychological evaluation reads very much like his previous evaluations. Both his 1995 and 1997 evaluations agree

that Winston was "cooperative" but very "immature." J.A. 1917, 1979. Where Winston largely disclaims responsibility for his own bad acts in the 1995 evaluation, he "reports that he does not feel guilty after doing something wrong" in the 1997 evaluation. J.A. 1919, 1981. With regard to I.Q. scores, his verbal I.Q. for both the 1995 and 1997 evaluations was consistent at 60, which both evaluations describe as being within the range of "mild mental retardation". J.A. 1918, 1980. His performance I.Q. scores on his 1987 and 1990 tests were actually lower than his score on the 1997 test, and his 1990 and 1997 evaluations both describe his nonverbal skills as "borderline." J.A. 1913, 1980. Finally, each of the evaluations describes his intellectual functioning at various points as "limited", "borderline", or "mentally deficient." J.A. 1910, 1915, 1921, 1982.

Despite these similarities between what was introduced and what was not, Winston argues that "the information possessed by the jury was tremendously incomplete." Appellant's Br. at 77. The question, of course, is whether the information possessed by the jury was materially incomplete. Although the jury did lack certain details, Winston cannot suggest prospects for the material omission category except for the single one-page document in which Fairfax County changed his primary disability classification to "mild retardation", J.A. 1876, and the 1997 I.Q. score of 66. While Winston's classification and 1997 I.Q. score are material to his *Atkins* claim, there is no reason to believe that these items would have been persuasive to the jury as ordinary mitigating evidence. With all of the similarities between the submitted and unsubmitted evaluations described above, the question is whether the classification and the additional low score would have made a difference. Because the reports before the jury had already classified Winston's verbal abilities as mildly retarded, we cannot conclude that a more general classification of mild retardation would have made a material difference. Similarly, we cannot conclude that the difference between a score of 73 and 66, while perhaps critical to a finding of mental retarda-

tion under *Atkins*, would have made a material difference to a lay juror considering a broader range of mitigation evidence about intellectual functioning.

The dissent contends that the jury did not possess at least ten items of material information. In most of the instances cited, however, the jury either had the information or had information that was essentially indistinguishable. Items 3 (deficient verbal skills) and 5 (twice failing kindergarten) cited in the dissent were noted in Winston's 1995 and 1987 evaluations. J.A. 1909, 1918. Items 4, and 6-10 all comment on various specific deficiencies, some of which were discussed in the other evaluations, J.A. 1920-21 (items 7 and 9 — failure to understand social expectations or properly handle money), while others such as item 4 (evenly delayed functioning in all areas) are merely syntheses of previous observations. This again leaves only Fairfax County's retardation classification and the 1997 I.Q. score, and, as explained above, these omissions were not material.

Winston's third and final argument — that his trial counsel did not adequately present the jury with evidence of his traumatic childhood — also fails. Defense counsel called four witnesses to illustrate his traumatic childhood: a social worker who testified as to his itinerant experience in foster care; and his mother, grandmother, and great-grandmother, who testified as to his poor upbringing and his exposure to drugs and crime at a very young age. While we have no doubt that Winston's counsel could have painted a more detailed picture of his childhood, we cannot conclude that the picture they did paint was somehow materially incomplete. Winston's argument appears to be that further embellishments, greater detail, and more forceful advocacy would have changed at least one juror's mind. He does not argue, however, that the mitigation case or traumatic childhood his counsel did present to the jury was misleading or that it left out critical facts. *Cf. Williams*, 542 F.3d at 1342-43 (finding prejudice when counsel put on testimony describing defendant's childhood beatings as "ordi-

nary parental discipline" that occurred occasionally, rather than testimony describing the beatings as "serious assaults" involving "deadly weapons" that occurred "on a near constant basis"). The jury heard testimony concerning Winston's abandonment by a drug-abusing mother and his exposure to criminal life by his grandmother. It also saw documentary evidence describing his many difficulties coping with his sub-average intellectual functioning. Because the jury still recommended death in light of this evidence, we cannot conclude that the Supreme Court of Virginia unreasonably applied *Strickland* when it held that a more detailed mitigation case would not have changed even a single juror's mind.

In reaching a contrary conclusion, the dissent gives inadequate consideration to AEDPA's standard of review. The dissent does argue that it "can find no reasonable theory under which the evidence disregarded could be considered cumulative," *infra* at 61, because Winston's counsel left out "even the most basic details of Winston's childhood," *infra* at 63. As we explained above, however, we do think that such a reasonable theory existed and that counsel did present the basic details of Winston's admittedly troubled childhood to the jury. Again, the Virginia Supreme Court may have been wrong to adopt such a theory, but we cannot conclude that it acted unreasonably.

In summary, even if we assume deficient performance by Winston's counsel, we conclude that the Supreme Court of Virginia did not unreasonably apply federal law when it held that counsel's performance did not prejudice Winston's case in mitigation.

## IV.

For the foregoing reasons we affirm the district court's denial of Winston's claims except with respect to his *Atkins* and *Atkins*-related ineffective assistance claims. With respect to the *Atkins* and *Atkins*-related claims, we vacate the district

court's decision and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

**Volume 2 of 2**

GREGORY, Circuit Judge, concurring in part and dissenting in part:

Today's decision overlooks the prejudice that Leon Jermain Winston suffered from the utter failure of counsel to investigate and present mitigating evidence at the penalty phase where he received a capital sentence. If we are to safeguard the Sixth Amendment right to effective assistance of counsel in criminal cases, then we must conduct a meaningful review of the record when, as here, there is a vast quantity of unquestionably mitigating evidence that was never presented to the jury. Moreover, while it appears that Winston failed to raise the issue in his state habeas petition, I disagree with the majority's merits-inquiry denying Winston's claim that his due process rights were violated by the state court's refusal to instruct the jury on lesser included homicide charges. The majority misinterprets the evidence at trial by equating evidence placing Winston at the scene with evidence that Winston was the triggerman. Only the latter satisfies Virginia's requirement for a capital conviction. Therefore, I respectfully dissent from the portions of this opinion denying those two claims, but I concur in the majority's judgment as to the remaining issues.

I.

In section II.B, the majority concludes that Winston's due process rights were not violated when the state court denied his request for instructions on lesser included homicide charges. I agree that Winston did not raise this issue in his state habeas petition. Because the majority proceeds to reach the merits and because the Commonwealth did not raise the issue of exhaustion in the district court or before this Court, I note my disagreement with the majority's assessment.

The merits inquiry is guided by the Supreme Court's decision in *Beck v. Alabama*, 447 U.S. 625 (1980). In *Beck*, the Court announced the principle that

capital defendants have a constitutional right to receive a jury instruction on a lesser-included offense "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense-but leaves some doubt with respect to an element that would justify conviction of a capital offense."

*Hyatt v. Branker*, 569 F.3d 162, 174 (4th Cir. 2009) (quoting *Beck*, 447 U.S. at 637); *Bates v. Lee*, 308 F.3d 411, 420 (4th Cir. 2002). The Court concluded that finding otherwise would "enhance the risk of an unwarranted conviction." *Beck*, 447 U.S. at 637.

The Supreme Court subsequently explained that "due process requires that a lesser included offense instruction be given *only* when the evidence warrants" it. *Hopper v. Evans*, 456 U.S. 605, 611 (1982). I agree with the majority that Virginia's rule poses no constitutional problem because it is consistent with the federal rule and that the application of the two rules is identical. What the majority fails to appreciate is that this Court has found that whether the evidence warrants the instruction is *not* a sufficiency of the evidence question. *See Hyatt*, 569 F.3d at 174. Instead, "*Beck* requires a lesser-included offense instruction when the evidence at trial merely casts 'some doubt' on a *necessary element* of the capital charge." *Id.*; *cf. Taylor v. Workman*, 554 F.3d 879, 887 (10th Cir. 2009) (finding that *Beck* clearly holds that courts are not to determine which instruction they feel is most warranted but instead must give the lesser included offense instruction in every case where the evidence supports it).

Under Virginia law, the "element that would justify conviction of a capital offense," *Beck*, 447 U.S. at 637, in this case is that Winston is a principal in the first degree. *Frye v. Commonwealth*, 345 S.E.2d 267, 280 (Va. 1986). Winston argues that because there was evidence that he was not the trigger-man, and therefore not a principal in the first degree, he was

constitutionally entitled to lesser included offense instructions on non-capital murder. The majority today agrees with the Supreme Court of Virginia that there was "overwhelming evidence . . . that Winston was the triggerman responsible for Rhonda's death." *Winston v. Commonwealth*, 604 S.E.2d 21, 44 (Va. 2004). When a state court has decided whether a lesser included offense instruction is necessary, this Court has unmistakably affirmed that federal court review in the habeas context is limited by the Antiterrorism and Effective Death Penalty Act of 1996. *See Hyatt*, 569 F.3d at 166. Even given this deferential standard, I find the state court's determination of the facts to be unreasonable.[1]

Evidence at trial supported Winston's requested instructions for lesser included homicide charges and his theory that he was present at the scene but was not the triggerman, casting "some doubt" on one element necessary for his capital conviction. Niesha Whitehead, the *only eye witness*, testified on direct and cross to facts showing Winston was not the triggerman. In fact, Niesha, the government's witness, did not identify Winston. On the stand, Niesha testified that it was the

---

[1]Contrary to the majority's assertion, the state court's determination that there was "overwhelming evidence" pointing to Winston as the triggerman is not exclusively a legal determination. *Supra* at 16. The state court correctly identified the applicable law to resolve this issue. However, the court's reading of the facts is what I find not only incorrect but also unreasonable.

If the majority does read the court's statement as a legal determination, then the state court engaged in an unreasonable application of clearly established federal law. "Under *Beck*, courts are not directed to evaluate the evidence to determine whether it would support a first degree murder conviction, or even whether a conviction for first degree murder or a lesser-included offense is better supported." *Taylor*, 554 F.3d at 887. Rather, "[t]he proper inquiry is whether the defendant presented sufficient evidence to 'allow a jury to rationally conclude' that the defendant was guilty of the lesser-included offense." *Id.* at 888 (citation omitted). Thus, if, as the majority suggests, the state court determined that the lesser included offense instruction was not warranted "in light of" the evidence supporting the capital murder charge, it unreasonably applied *Beck*.

man wearing all black that shot her mother. J.A. 37, 45-46. She also testified that the other man was wearing stripes and tried to stop the shooter. J.A. 45. Unrebutted evidence existed that Winston was wearing stripes. *Winston*, 604 S.E.2d at 44. Contrary to the majority's contention, Niesha's testimony was not inconsistent concerning the clothing of the two men. When first asked what the shooter was wearing, Niesha responded, "All black." J.A. 36. At that time, on direct, she stated that she could not recall whether the clothing had stripes in it. J.A. 37. Throughout the rest of her testimony, Niesha stated that there was one man in "all black" and one wearing stripes. J.A. 42, 44, 46-48. She testified that it was the man in "all black" that pulled the trigger. J.A. 44-46.

Niesha also testified that the shooter was taller than her father, Anthony Robinson. J.A. 48-49. Winston was shorter than Robinson. J.A. 216, 222. The majority relies on Niesha's testimony that a man with a tattoo was the shooter. However, Niesha was shaky on which man in the house had a tattoo, testifying both that it was the shooter *and* the non-shooter. J.A. 38-39, 47-48. Thus, that Winston had a tattoo is not determinative of which person was the triggerman.[2]

The majority finds that I am not "troubled" by the weaknesses in Niesha's testimony. *Supra* at 15. However, the fact that Niesha's testimony is inconsistent on which man had a tattoo does not signify that it lends no support to Winston's requested instructions. In fact, the main inconsistency in Niesha's testimony, which person had the tattoo, undermines the majority's position, not Winston's. If Niesha's testimony were truly undermined as a whole, as the majority suggests, *supra* at 15-16, it seems unusual that the majority cites to her testimony in support of its position. Thus, given the dearth of evidence directly proving that Winston was the triggerman,

---

[2]Other than which person at the scene had a tattoo, Niesha's testimony was consistent with the fact that Winston was *not* the triggerman.

Niesha's testimony cast some doubt on an element necessary for Winston's capital conviction.[3]

Other than the testimony of Rorls, whose credibility was questioned at trial, no evidence relied on by the majority can be characterized as "overwhelming" evidence that Winston was the triggerman on April 19, 2002.[4] The majority cites to evidence that only places Winston at the scene, which is insufficient for a capital conviction under Virginia law. While there was testimony that Winston's DNA was on the gun used, this does not prove that Winston pulled the trigger on the date in question.[5] For example, Winston could have supplied the gun or he could have simply hidden the gun after the shootings to cover up his complicity. Neither of these scenarios would have made Winston death-eligible. Additionally, Niesha testified that both men were wearing gloves. J.A. 42.

Because the evidence in this case casts *some* doubt that Winston was the triggerman, an element necessary for conviction of the capital offense in Virginia, Winston was entitled to an instruction on the lesser included homicide charges. Some doubt is all that is required. In finding that there was "overwhelming evidence . . . that Winston was the triggerman responsible for Rhonda's death," *Winston*, 604 S.E.2d at 44,

---

[3]Niesha's testimony was not the type of self-serving testimony of a criminal defendant or of an incredible witness with a bias towards the defendant. Her testimony in favor of Winston was first elicited by the Commonwealth.

[4]Contrary to the majority's assertion, I do not minimize the significance of relevant evidence. In fact, it is not our job to weigh the evidence or search for evidence to support the instruction given. While I recognize that there is evidence in support of the jury's verdict, this is not a sufficiency of the evidence issue. The question is whether the evidence at trial cast some doubt that Winston was the triggerman—whether the state court made an unreasonable determination of the facts in finding that the evidence that Winston was the triggerman was "overwhelming."

[5]The majority cannot simply draw "inferences" in only one direction. *Supra* at 16. Again, this is not a sufficiency of the evidence issue.

the state court made an unreasonable determination of the facts.

## II.

In section III.B, the majority inadequately considers Winston's claim that his counsel was constitutionally ineffective by not reading relevant records in his possession, passing along four incomplete psychological reports to jurors without explanation, failing to mention Winston's classification as mentally retarded, failing to present evidence of Winston's adaptive deficits and cognitive difficulties, and presenting extraordinarily minimal mitigating evidence about Winston's childhood in a generalized and unpersuasive manner given the reasonably accessible material available. Rather, the majority puts forth alleged arguments made by Winston that fail to represent his entire claim. Looking at the whole record and Winston's complete argument, I must depart from the majority and find that the state court was unreasonable in dismissing Winston's claim that he received ineffective assistance of counsel at the sentencing phase of his trial.

## A.

In this case, the performance prong of *Strickland* entails assessing whether counsel satisfied his duty to consider and investigate mitigating evidence for sentencing in a capital case. It is a "well-defined norm[ ]" that "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence.'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting American Bar Association ("ABA"), *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* 11.4.1(C) 93 (1989) (hereinafter *Guidelines*)). According to the ABA Guidelines in effect at the time, counsel had a duty to consider presenting medical evidence, educational history, and family and social history, especially in a capital case. *Guidelines* 11.8.6. Counsel plainly

cannot perform this duty when not reasonably informed about the case.

Although courts cannot second-guess the strategic choices of counsel, counsel must be informed to act strategically. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 389-90 (2005) (concluding a decision not to pursue certain mitigating evidence cannot be strategic if it is based on inadequate investigation); *Wiggins*, 539 U.S. at 527-28 (finding a cursory investigation insufficient to support any tactical decision). Here, counsel was in no way informed. Counsel testified he had *no strategic reason* for not pursuing further mitigating evidence. J.A. 656, 674-75, 677, 681. Furthermore, counsel failed to read records in counsel's possession and made no reasonable effort to discover mitigating evidence that was unmistakably available. While Winston's counsel had the assistance of an investigator, no mitigation investigation occurred nor was a mitigation specialist provided. Instead of reviewing the records regarding Winston's case in his very possession, counsel abdicated his constitutional duty by relying on Dr. Nelson, who had been appointed to evaluate Winston, to review them.

When analyzing whether counsel's deficient performance was cause for the procedural default of Winston's *Atkins* claim, the district court correctly recognized that "capital trial counsel cannot outsource their fundamental responsibilities." *Winston v. Kelly*, 600 F. Supp. 2d 717, 732 n.14 (W.D. Va. 2009). The court added that "[a]lthough counsel's 'strategic choices made after thorough investigation . . . are virtually unchallengeable,' [*Strickland v. Washington*, 466 U.S. 668, 690 (1984)], contextually, simply not reading essential documents that are facially significant to competent capital defense counsel did not seem to this court to be any choice at all." *Id.* at 732. The court inexplicably and inappropriately failed to apply this logic when deciding whether the *same counsel* was ineffective in failing to investigate and present mitigating evidence. *See Winston v. Kelly*, 624 F. Supp. 2d 478, 512 (W.D. Va. 2008).

While the Supreme Court has recognized that "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up," the Court has also found failure to review relevant files that are easily accessible can be objectively unreasonable and that reasonable counsel would investigate further in the absence of "good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 382-83, 389-90. Without reading the records, counsel had no strategic reason to think further investigation was unnecessary. Additionally, unreasonableness can be heightened by the easy availability of the mitigating evidence. *See id.* at 389-90. Here, counsel had the documents in his possession containing mitigating evidence and leads to easily-located evidence. Even a cursory review of this record shows that the district court erred when it held that the state court was reasonable in finding that counsel's limited efforts at sentencing were not deficient.

## B.

On the second prong of *Strickland*, the state court unreasonably determined that Winston was not prejudiced by counsel's deficient performance. A thorough review of the record demonstrates that but for counsel's deficient conduct, a reasonable probability exists that at least one juror would have voted against the death penalty. At sentencing, counsel presented a few witnesses, asked them yes or no questions spanning less than thirteen transcript pages, threw several incomplete psychological evaluations at the jury without explanation or context, and hoped for the best. The minimal evidence counsel *did* present is at stark contrast with the mountain of mitigating evidence that was readily available, including evidence of mental deficiencies and evidence of Winston's emotional distress, neglect, and abandonment throughout childhood.

Setting aside whether Winston satisfies the Virginia defini-

tion of mental retardation,[6] evidence of mental deficiencies is certainly mitigating. Counsel here undisputably failed to present to the jury a *classification of Winston as mentally* retarded that was in counsel's possession. The majority apparently finds this harmless, reasoning that "there is no reason to believe that these items [the classification of mental retardation and 1997 I.Q. score of sixty-six] would have been persuasive to the jury as ordinary mitigating evidence." *Supra* at 39. This assertion misses the mark, and despite the majority labeling the classification a "single one-page document," *supra* at 39, it is the only classification of Winston as mentally retarded that existed and was thus supremely relevant to assessing mitigating evidence. While a specific score may or may not be influential to a lay juror,[7] a *classification* as mentally retarded certainly would have been *materially* significant to the jury when considering evidence about Winston's sub-average intellectual functioning. The majority finds the classification immaterial by characterizing it as "more general" than the classifications of Winston's verbal abilities that the majority assumes the jury read and could correctly interpret. *Supra* at 39-40. However, the 1997 evaluation in pertinent part states that

Leon earned a Verbal IQ score of 60 and a perfor-

---

[6]Based on the evidence before this Court, Winston has a strong claim that he is mentally retarded under Virginia law and that the default of that claim should be excused based on cause and prejudice resulting from ineffective assistance of counsel. I therefore fully concur with our decision today to remand this case to the district court so that it may properly consider evidence that came to light at the evidentiary hearing.

[7]The majority cites to several of Winston's verbal I.Q. scores as evidence before the jury of Winston's deficient verbal abilities. If these scores are material to the jury's evaluation, then surely the same must be said of an overall I.Q. score of sixty-six, lower than all the overall I.Q. scores contained in the reports handed over to the jury. And if the majority assumes the jury could interpret the verbal I.Q. scores and classifications, by the same token we should assume the jury understands that a full scale I.Q. score is the score used to classify a person as mentally retarded.

> mance IQ score of 77, resulting in a Full Scale IQ score of 66. Based on his Full Scale score, Leon is currently functioning in the Mentally Deficient range of intelligence, and might be expected to achieve better than one percent of his age group in academic areas.

J.A. 1980. Thus, it is clear that a juror reading such evaluation would place more importance on a full scale classification and score than that of a sub-part. It is the full scale score that is used to classify a person as mentally retarded.

Beyond the failure to present the classification, counsel did not provide the jury with information from certain teachers, social workers, and family members whose input would have been essential to evaluate Winston's mental state and adaptive functioning. The majority concludes that Winston is asserting that his counsel was constitutionally inadequate purely because live witnesses did not present the information. *Supra* at 37-38. This conclusion is incorrect. Winston's argument is that the information was not presented *at all* because (1) counsel's investigation was unreasonably wanting, Petr.'s Br. 78, and (2) "the information possessed by the jury was tremendously incomplete," *id.* at 77. It is undisputed that, as discussed above, counsel did not read records in his possession nor conduct a full investigation.

As for information regarding Winston's low intellectual functioning, the majority relies heavily on the psychological reports entered into evidence. The majority finds that the reports contained "rich content" "describing [Winston's] many difficulties coping with his sub-average intellectual functioning." *Supra* at 37, 41. However, to clarify, the evaluations constantly referenced external documents,[8] and there-

---

[8]Historical and detailed information about Winston was referenced in the documents, but not provided. As an example, the 1995 evaluation states that "[d]etails of Leon's family life are available to the court, and so will not be reported here in great detail." J.A. 2075. The "details" referred to were never provided to the jury.

fore, the jurors received incomplete information *even if* we assume that they read and understood the evaluations. Counsel presented Crystal Carper from the Fairfax County Department of Family Services to authenticate the evaluations. As Carpenter had *no personal knowledge of the evaluations*, she could not speak to their information, and the documents were merely entered into evidence. Simply sending incomplete records back with the jury without explanation or context does not save counsel's constitutionally deficient performance in this case. *See Johnson v. Bagley*, 544 F.3d 592, 602 (6th Cir. 2008) (finding that "an unreasonably truncated mitigation investigation is not cured simply because some steps were taken prior to the penalty-phase hearing and because some evidence was placed before the jury").

The information before the jury concerning Winston's sub-average intellectual and adaptive functioning was also materially incomplete because counsel failed to seek out those most familiar with Winston in these areas. If the jury had this information, there is a reasonable probability that at least one juror would have voted against the death penalty. That the state court found otherwise is unreasonable. As an example, two of the people that counsel did not speak with were Kirsten Jackson and Denise King. Jackson, Winston's aunt, who was three years his junior, was never contacted by counsel despite living with Winston for almost ten years until Winston was age seventeen. Among Jackson's testimony at the evidentiary hearing is the following:

> you could tell him to wash the dishes, and you would come back and the dishes weren't done, and he was just standing there trying to figure out what he was supposed to be doing. Anything, any chore he was supposed to be doing, you had to constantly go back and remind him. . . .
>
> . . . .

His hygiene was good when he lived with us because my mom constantly made sure he took a bath. . . . And afterwards, it was—when he moved out, it was something totally different. He always looked dirty, like just smelled nasty, just untouchable. You didn't want to touch him; that's how dirty he looked.

. . . .

I think my mom bathed him until he was about 10, 11. He had to be watched until he was about that age.

. . . .

. . . we had one incident where he fell asleep in the tub and had a bowel movement in the tub. And we were trying to figure out where he was at and what was going on. We went upstairs, and he told us it was just toys, and he started playing with it.

. . . .

You couldn't have a conversation with him. He couldn't comprehend what everyone was saying. Talking to him was talking on a different level. It was like you were talking to someone like—that was five or six years old, that he constantly was—like he would joke at the wrong times, or he could—if he couldn't comprehend, like, or have the conversation that we were having, he would like sort of mimic what everyone was saying and converse in that way, and just—it was impossible.

. . . .

His idea of friendship was if he did something for them, that that was his way of getting them to like him[.]

. . . .

> He was never able to do his homework. Things that his teacher would send him home with, he couldn't comprehend it, he didn't understand it. Even if it was told to him how to do it at school, he would still come home and couldn't figure it out, and I would have to explain to him what the teacher meant and what he was supposed to be doing. And he would generally get frustrated, agitated, and get upset, want to fight just because he didn't know it. Just spelling and all of that, he didn't have a good subject in school.

J.A. 725-31.

Denise King was Winston's teacher for four years at the Leary School, a school of last resort for students in Fairfax County who were experiencing learning and behavior difficulties. King spent on average seven hours a day with Winston, then age eight, and yet she was never contacted. At the evidentiary hearing, she testified that Winston had great difficulty reading and following directions. Among King's testimony about Winston at the hearing is the following:

> He posed a particular dilemma to me because I thought I came equipped to help students with special needs, and I could not teach Leon to read; he was a particularly difficult student to teach. . . .

> . . . .

> I always felt like Leon was not very well cared for. He was interested in school, but I think he had a lot of things going on at home. . . . I think even his physical needs weren't taken care of. His clothes didn't seem to be his own; they appeared too big for

him. And we didn't have a lunch program at the school, and Leon didn't come with food.

. . . .

I think he had auditory processing problems. He didn't understand a lot of what he heard. If it was more than one or two directions, he had trouble following it. He misinterpreted social cues. He misinterpreted what people said. He took things very literally. I think his abstract reasoning and long-term memory were probably very limited as well.

. . . .

Leon was the lowest student for the whole four years that I had him. . . .

. . . .

I don't think he knew what a reciprocal friendship was like. A friend was somebody who was, if you were hungry, would give you a cookie, or if you were thirsty, would give you a soda. But other than that, I don't think that he even understood what friendships and that kind of thing were all about.

. . . .

He had no real sense of time. You know, it's dark outside or it's light outside, but other than that, not really.

. . . .

And Leon did not have any idea where the school was in reference to where he lived. . . . And he

wouldn't leave early because he didn't know how to get home.

. . . .

I saw very small changes in his academics. . . . There are students that, yes, would adapt to the situation, and once they got into sort of the groove of how the school goes, that's when they catch on and they really start to learn. That was not the case with Leon. He never got it. He never understood how school went and how—it was every day was a new day, every day.

J.A. 741-54.

In addition to testimony from Kirsten Jackson and Denise King, other evidence of mental deficiencies *not presented* due to counsel's failures includes the following:

1.  Fairfax schools classified Winston as mentally retarded in 1997, as mentioned above, J.A. 1876;

2.  The 1997 classification, as well as other documents in counsel's possession, identified Marilynn Schneider Lageman ("Lageman") as a psychologist and a member of the Special Education committee that recommended the 1997 evaluation. Winston produced a 1997 evaluation by Lageman conducted on Winston, which included a verbal I.Q. score of sixty and a full-scale I.Q. score of sixty-six. This full-scale score is more than two standard deviations below the mean, compelling evidence of mental retardation under the Virginia definition. Lageman was never contacted, J.A. 1232, 1876;

3. By 1997, sixteen year-old Winston demon-strated "verbal cognitive skill development within the mild range of mental retardation for his age," J.A. 1980;

4. Winston's 1997 "evaluation [showed] a fairly evenly delayed profile of cognitive, social, and emotional functioning, generally within the mild range of mental retardation," J.A. 1982;

5. Winston failed kindergarten twice and had severe academic struggles, J.A. 1909;

6. By age fourteen-and-a-half, Winston had not developed age-appropriate ability to tell time or learn the months of the year, J.A. 751-52;

7. Lageman noted "[i]t [was] particularly surpris-ing how little Leon appear[ed] to understand social expectations and the reasons behind social practices." J.A. 1980;

8. After being placed in the custody of Fairfax County, Winston "had extremely low intellec-tual functioning" and experienced severe emo-tional distress, J.A. 1359, 1799;

9. Winston's handling of money was "inadequate by almost any standard" and he "never had a checking account, a savings account, a credit card, an apartment/home lease or ownership in his name," J.A. 1257;

10. Winston never had a job of any type other than selling drugs on the street; even at this, other persons gave him instructions and the drugs in

pre-divided quantities with set prices, J.A. 896-97, 1258.[9]

Additionally, because not reasonably informed, counsel failed to present consequential evidence of Winston's childhood of emotional distress, neglect, and abandonment, including the following:

1. Winston's mother could not stand to be around him and was violent with her children, J.A. 429;

2. The "void left by his mother's absence was never filled, and the negative influence(s) of her criminal activity were never replaced with positive ones," J.A. 1358;

3. While the jury did hear that Winston's grandmother ran a shoplifting operation, it did not hear that it was Winston who blew the whistle on the operation when he was picked up by Fairfax County Juvenile Detention after his family left him behind and fled as the operation was busted, J.A. 1352;

4. Because Winston had no real caretaker in his life, he "was denied a real feeling of family and belonging," J.A. 1358;

---

[9]Despite the majority's herculean efforts to comb the record and find some of the facts listed buried in the reports entered into evidence, *supra* at 40, the jury found *no* mitigating factor. Thus, we cannot ascertain whether the jury glanced at the reports, much less considered the reports in depth as the majority has. The jury was given little reason to read the reports. The reports were given no context or explanation. Not one witness spoke personally to any of the information contained in the reports. Furthermore, as mentioned previously, the reports were materially incomplete.

5. At age fifteen, Winston was "struggling significantly with trust versus mistrust issues due to all the abandonment and loss in his lifetime." J.A. 72;

6. At the Leary School, Winston was "struggling to make sense out of the world" because of his abandonment and upbringing, J.A. 1345;

7. A teacher at Leary noticed that "Leon's concept of right and wrong never stood a chance," J.A. 1347;

8. Winston was easily manipulated, had few or no friends, and was never fully accepted by any peer group, J.A. 1347, 1370;

9. Winston was consistently described by family, counselors, and teachers as a child characterized by gullibility, immaturity, passiveness, a lack of self-esteem, and a desperate need for peer acceptance, J.A. 1255-56;

10. Winston was diagnosed with Fetal Alcohol Syndrome, J.A. 1271.

In spite of all the above evidence *not presented to the jury*, the state court found no prejudice on the ground that the evidence was cumulative. I can find no reasonable theory under which the evidence disregarded could be considered cumulative.

The negligible evidence of Winston's childhood that was before the jury gave an "incomplete and misleading understanding of [Winston's] life history." *Williams v. Allen*, 542 F.3d 1326, 1331, 1340 (11th Cir. 2008). As I found previously, the evaluations were both unexplained and incomplete. Also, counsel presented three witnesses to speak solely on Winston's social history: his mother, grandmother, and great

grandmother. In totality, these witnesses represent less than thirteen transcript pages and provided only vague generalities about Winston's upbringing, generally through yes or no answers. Consider an excerpt from Winston's mother's testimony at sentencing:

Q. And how old was he when you went to the penitentiary?

A. Six and a half.

Q. Okay. And what are you in the penitentiary for?

A. Malicious wounding, firearm and robbery.

. . . .

Q. Was Leon with you when that crime was committed?

A. Yes, sir.

. . . .

Q. Has Leon's father ever been involved in his life?

A. No, sir.

. . . .

Q. When you became pregnant with Leon, what were some of your habits?

A. You mean as —

Q. Well, did you stick strictly to drinking tea and milk and things like that or did you drink something else?

A. Alcohol. I did drugs.

J.A. 240-41. When contrasting the one- or two-word answers by three witnesses with the mitigating evidence available, the state court unreasonably determined that but for counsel's deficient conduct, a reasonable probability did not exist that at least one juror would have voted against the death penalty. For example, Winston's mother never described him as a child, never told a story of him growing up, nor provided any examples to humanize him. Astoundingly, she was never asked to. This dearth of even the most basic details of Winston's childhood[10] stands in stark contrast to his mother's affidavit, submitted *two years later*:

> I was 15 years old when I got pregnant with Leon. I was never in a relationship with his father, Leon Johnson. I knew his father because he was a junkie and I was doing a lot of drugs and drinking at the time. When Leon Johnson found out that I was pregnant, he denied that it was his baby. I have never seen him since then.
>
> I remember that it took Leon a long time to learn how to use the toilet by himself. After he stopped using diapers, he used to wet the bed a lot as a child. He also had problems talking—he stuttered a lot. Leon had a really hard time understanding directions I would give him. For instance, I remember that I would often ask him to get me "the chair," and I would point toward the chair that we kept next to the refrigerator in the kitchen. He did not seem to understand what I was talking about; he would just look

---

[10]The majority finds that "counsel did present the basic details of Winston's admittedly troubled childhood to the jury." *Supra* at 41. It is difficult to imagine a capital case in which less testimony at sentencing was presented by defense counsel. The thirteen transcript pages relied on by the majority is bereft of anything approaching the meaning of "details."

back at me and say, "which chair," even though it was the only chair in the kitchen and the same chair I always wanted him to get for me. . . .

. . . .

I continued to drink and use drugs after Leon was born and during and after I was pregnant with my other two sons. During the times that I was living with my children, I would drive them to school. After I dropped them off at school, I would go to the liquor store when it opened at 10:00 a.m. I would buy a pint of Barcardi rum and go to my friends' house and drink it during the day. Sometimes I would finish it by the time I went to pick up the kids, and sometimes I wouldn't. I would usually go get some food at Burger King or McDonalds to try to bring down my high around the time I picked up my kids. I was also using still using [sic] drugs when the kids were in school. . . .

Leon started school before I went to prison. On some days, I was sober enough in the afternoon to try and help Leon with his homework. He had a really hard time with it, and I always thought that he was going to have problems learning. Leon had these ABC blocks, but he could never manage to put them in the right order. . . .

There were times when we lived with my family members and times when we lived with my boy-friends. We moved around a lot. . . . I often left Leon with my family so that I could go hang out with my friends and get drunk and high.

. . . .

When I was dating Raymond Jackson, Leon told me once that Raymond beat him when I wasn't around.

> . . . I saw marks and bruises on his back once. . . .
> I just wasn't much of a parent to my children. I did
> not give them the love and attention they deserved to
> have. Two of my three children are currently in
> prison.

J.A. 1361-62. The dramatic detail contained in this affidavit plainly was not presented to the jury. Rather, counsel's presentation about Winston's childhood was haphazard and woefully incomplete.

Given the evidence cited herein of Winston's mental deficiencies and traumatic childhood, coupled with the absence of evidence that Winston was the triggerman, there is a reasonable probability that at least one juror would have voted against the death penalty.[11] As the Supreme Court found in *Rompilla*, 545 U.S. at 393 (citations omitted), the evidence now before this Court

> adds up to a mitigation case that bears no relation to
> the few naked pleas for mercy actually put before the
> jury, and although . . . it is possible that a jury could
> have heard it all and still have decided on the death
> penalty, that is not the test. It goes without saying
> that the undiscovered "mitigating evidence, taken as
> a whole, 'might well have influenced the jury's
> appraisal' of [Winston's] culpability," and the likeli-
> hood of a different result if the evidence had gone in

---

[11]To exacerbate this prejudice, the nature of the information not presented is exactly the type that jurors find persuasive. Evidence of a diminished mental capacity, along with evidence of a traumatic childhood is precisely the kind of evidence that reduces a defendant's moral culpability and provokes sympathy from the jury. This Court has found that evidence of mental deficiencies "can be persuasive mitigating evidence for jurors considering the death penalty, and this evidence can determine the outcome." *Gray v. Branker*, 529 F.3d 220, 235 (4th Cir. 2008); *cf. Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004) (finding that evidence of mental deficiencies "garners the most sympathy from jurors").

is "sufficient to undermine confidence in the outcome" actually reached at sentencing.

### III.

In this capital case, the performance of counsel was abysmally deficient. Had the jury been able to place Winston's troubled childhood and background, along with the evidence of his mental deficiencies, "on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. Additionally, I would find that Winston was unconstitutionally denied lesser included homicide instructions. Accordingly, I would reverse the state court's adjudication of Winston's ineffective assistance of counsel claim and due process claim as unreasonable and remand for resentencing. On this basis, I dissent.